UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RICKEY CALHOUN,

                            Plaintiff,

        v.

PETER ROBINSON,

                            Defendants.

No. C08-5744 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  April 23, 2010**

        Before the Court is the motion for summary judgment of Defendants Peter Robinson, Kent Ruby, Latoya Holmes-Ware and Jamele Anderson.  Dkt. 52.  Plaintiff, Rickey Calhoun, filed a response with supporting declarations (Dkts. 81, 82 and 83), and Defendants filed a reply. (Dkt. 86).[1]

        Having carefully reviewed the motion and balance of the record, and viewing the evidence in the light most favorable to Mr. Calhoun, the undersigned recommends that the Defendants' motion for summary judgment be granted.

--------
[1] On October 12, 2009, the court granted Mr. Calhoun's second extension of the discovery deadline and renoted the Defendants' summary judgment motion for December 11, 2009.  Dkt. 70.  Mr. Calhoun was also granted an extension of time to respond to the summary judgment motion until January 22, 2010.  Dkt. 85.

REPORT AND RECOMMENDATION - 1

*BACKGROUND AND STATEMENT OF FACTS*

The following background summary and recitation of facts are based on the verified complaint and the declarations and exhibits filed in support of Defendants' motion and Plaintiff's response.[2]

Mr. Calhoun, a pretrial detainee, is resident no. 490146 at the Special Commitment Center (SCC) at McNeil Island, Washington.  Dkt. 9, p. 3; Dkt. 60, Exh. 2; Dkt. 82, pp. 1-2.  The SCC is a Department of Social Health Services (DSHS) residential treatment facility for those detained or awaiting trial on their detention pursuant to Washington's sexually violent predator statute, Rev. Code Wash. Chapter 71.09.

According to Mr. Calhoun's Amended Complaint, the incident which forms the backbone of his claims occurred in early January 2008 when an SCC employee, Richard Mays (who is not a party to this action) seized a disk from a fellow detainee (who is also not a party to this action). Mr. Mays gave the disk to SCC investigators to determine whether there was anything improper on the disk.  Dkt. 9, p. 7.  According to Mr. Calhoun, the disk contained a copy of a legal brief he had completed for the Court of Appeals, Division One.  He provided this copy to the fellow detainee for purposes of "perusal and feedback."  Dkt. 9, p. 7.  When Mr. Calhoun became aware of this seizure, he contacted and complained to his attorney, Mr. Eck.  On January 16, 2008 Mr. Eck wrote to Wendy Lux at the Attorney General's Office regarding the computer disk that had been seized.  AAG Rachel Feldstein replied by e-mail on January 25, 2008, and advised that the disk did not contain any inappropriate material and had been returned to Mr. Calhoun.  Dkt. 59, Exh. 1.

---

[2] Defendants' motion to strike the declarations of Mr. Calhoun and Mr. Eck is addressed in further detail below.

REPORT AND RECOMMENDATION - 2

On January 23, 2008 Defendant Robinson asked Mr. Calhoun to submit a random urinalysis test (UA), which he refused.  Dkt. 53.  Because of his refusal to provide a UA, Mr. Calhoun's room was searched.  Mr. Calhoun refused to give the requested UA because Defendant Robinson had not first spoken with Program Area 1 Manager Walter Weinberg and because Mr. Calhoun did not believe the UA was random, but rather in retaliation for his attorney intervening with regard to the seized floppy disk (the "floppy disk incident").  Dkt. 9, p. 7.  Mr. Calhoun states that he has been at the SCC for almost six years and had never before been requested to give a random UA.  Dkt. 82, p. 3.

According to Mr. Calhoun, any BMR, room search and/or UA should have been authorized by Walter Weinberg pursuant to any agreement entered into between counsel for Mr. Calhoun and counsel for the SCC in the case of *Rickey Calhoun v. State of Washington, et al.*, Pierce County Superior Court Cause No. 06-2-09956-2.  Dkt. 9, pp. 6-7; Dkt. 58, p. 1.  The agreement was set forth in a January 2007 email, that provides, in pertinent part:

> 1.      The sanctions imposed as a result of the 12/26/06 and 1/03/07 BMRs will be held in abeyance pending review by Dr. Richards, and to allow Mr. Eck the opportunity to interview staff and further investigate the facts underlying the incidents.
>
> 2.      Staff members Stephen Galbraith, Andy Anderson, Jim Fowler, and Randy Pechos are to interact with Mr. Calhoun only on an as needed basis and, if they seek to impose a BMR, request a room search or drug/alcohol test, or take other significant action with regard to Mr. Calhoun, such action must be reviewed and approved by Program Area 1 Manager Walter Weinberg before it may proceed….

Dkt. 58, Exh. 1.

On July 27, 2007, Mr. Calhoun's Pierce County case (No. 06-2-09956-2) was dismissed with prejudice on summary judgment.  Dkt. 58, p. 1; Dkt. 82, p. 3; see also, *Calhoun v. State of Washington*, 146 Wash.App. 877, 193 P.3d 188 (2008).  Mr. Calhoun appealed a part of the trial

REPORT AND RECOMMENDATION - 3

court's decision.  *Id.* at p. 192.  On September 30, 2008, the Washington Court of Appeals affirmed the trial court's decision.  *Id*.[3]

Mr. Calhoun's refusal to submit a random UA resulted in the issuance of a Behavioral Management Report (BMR) by SCC staff.  This created the need for an ARH panel hearing to determine whether the BMR was warranted and if so, the appropriate behavioral remedy.  The ARH panel hearing was conducted by Defendants Holmes-Ware, Anderson and Ruby.  Mr. Calhoun refused to attend the hearing.  The panel determined that the BMR was warranted and issued sanctions, to include placement on the Directed Testing Program (DTP) (which required six months of random urinalysis testing, all of which must be negative in order to be off the program).  Dkt. 54, ¶¶ 11, 12, and Exhibit 1.  Mr. Calhoun subsequently refused to submit to a requested random UA five additional times.  Five additional ARH panel hearings were conducted, all of which Mr. Calhoun refused to attend.  He was provided with written decisions regarding each hearing and in each decision, one sanction included recommencement of the six month testing requirement.  Dkt. 54, Exhs. 2-6.  Mr. Calhoun provided a clean sample in October 2008, continued to provide clean samples for six months, and was taken off the directed testing program in March 2009.  Dkt. 82, p. 5.

*Claims*:

In his First Cause of Action, Plaintiff asserts that the actions of the defendants "constitute restrictions on Plaintiff's right to file complaints against those he is incarcerated by" in violation of the First Amendment.  Dtk. 9, p. 10.

---

[3]Mr. Calhoun alleges additional facts under the heading of "historical background," which are not included here. These facts were the subject of a prior state lawsuit dismissed on summary judgment (See state court's order of dismissal submitted in C*alhoun v. Galbraith*, Case No. 08-5101RBL (Dkt. 81-5 therein)).  In Case No. 08-5101RBL, the court dismissed all incidents prior to April 2006 on res judicata grounds because they could have been litigated in Mr. Calhoun's state lawsuit.  *Id.*, Dkt. 94, p. 8; Dkt. 102, p. 1.

REPORT AND RECOMMENDATION - 4

The Second Cause of Action alleges that the defendants retaliated against Plaintiff because Mr. Calhoun's attorney intervened and demanded that the SCC return the disk that contained a copy of his brief and that this was in violation of the First and Fourth Amendments. Dkt. 9, p. 11.

The Third Cause of Action alleges that the defendants failed to treat the Plaintiff consistent with the punishments meted out to other residents all in violation to his right to due process, equal protection, invasion of privacy, and to be secure in one's dwelling, guaranteed by the Fourth and Fourteenth Amendments.  Dkt. 9, p. 11.

Within the body of the Amended Complaint, there also appears to be a claim that Defendants Holmes-Ware, Anderson and Ruby violated the Plaintiff's constitutional and statutory rights by starting "punishment over again before giving him the opportunity to get off the first 6 month program."

*Facts Pertaining to Each Defendant:*

*Defendant Peter Robinson.*  Peter Robinson is a Resident Rehabilitation Counselor 3 (RRC3) at the SCC.  Dkt. 53, ¶¶ 2-3.  On January 23, 2008, Mr. Robinson asked Mr. Calhoun to provide a random urinalysis (UA).  *Id.*, ¶ 5.  Mr. Calhoun admits that he refused to provide a sample. Dkt. 9, ¶ 28.  Mr. Robinson issued a Behavioral Management Report (BMR) to Mr. Calhoun for his refusal to submit to the UA in violation of SCC policy and Mr. Calhoun's room was searched in accordance with said policy.  Dkt. 9, ¶ 29; Dkt. 53, ¶ 4.

Defendant Robinson was not involved in the collection or return of the floppy disk and had no knowledge of that incident nor did he have any knowledge regarding Mr. Calhoun contacting his attorney regarding the disk.  Dkt. 53, ¶ 10.  He did not participate in Mr. Calhoun's AHR hearing on his BMR for refusing a UA and played no part in the decision to

REPORT AND RECOMMENDATION - 5

place Mr. Calhoun on the six-month DTP, or in any decision to continue him on that program. *Id.*, ¶ 11.

Defendant Robinson's job includes asking residents for UAs based on a weekly list given to him by his supervisor, Byron Eagle. *Id.*, ¶ 7. He was not involved in the creation of the DTP list. *Id.*, ¶¶ 11-13.

Mr. Eagle, who is not a party to this action, confirms that he created the random UA list in question on January 21, 2008 using computer software designed to generate random numbers. Dkt. 57, ¶¶ 4-9; Dkt. 57, Exh. 1 (UA list for week of January 21-26, 2008). Mr. Eagle knew nothing about the seizure of the floppy disk, Mr. Calhoun contacting his attorney or the January 2007 agreement. Dkt. 57, ¶ 8. He confirms that the random UA request of Mr. Calhoun and the room search after his refusal were done in accordance with standard SCC policy. *Id.*

According to Defendant Robinson, it would be a security violation for SCC staff to allow a SCC resident to see a list of residents with pending random UAs or random room searches because such a resident could warn other residents of the upcoming random test. Dkt. 53, ¶ 9. Mr. Calhoun agreed that it would be against the rules to show a resident a list of the random room searches or random UA conducted at the SCC. Dkt. 60, Exh. 2, p. 39:9-19.

*Defendant Holmes-Ware.* Latoya Holmes-Ware is the Social and Health Program Consultant for the SCC, which includes acting as a Hearing Officer for administrative complaints by residents at the SCC. Dkt. 54, p. 1. As a Hearing Officer, she presides over the Administrative Review Hearing (ARH) panel, which adjudicates BMRs issued by SCC staff to residents who appear to be violating SCC policy. The ARH hearing provides a forum for residents to air their side of a particular incident through an advocate. *Id.*, p. 2.

REPORT AND RECOMMENDATION - 6

According to Ms. Holmes-Ware, SCC residents all have or are suspected of having mental conditions which prevent them from properly functioning in society and therefore, some SCC residents take prescribed medication for their condition.  Non-prescribed drugs and alcohol, however, are banned from the SCC grounds.  Dkt. 54, p. 2.  Also, many residents of the SCC enter the facility with a history and/or present pattern of various chemical dependencies which contributed to their mental condition.  *Id.*  Random urinalysis helps residents confront their abuse of drugs, narcotics, and alcohol with scientific evidence of current use, and gives residents further incentive to abstain from drugs and alcohol and follow the therapeutic policies at the SCC.  *Id.*

Beginning in 2008, all SCC residents are subject to the random UA drug testing program.  Their room numbers are selected from a random computer program and then distributed to SCC staff assigned to notify the residents to report for UA testing.  Dkt. 54, p. 2.  If a resident refuses to give a UA, under SCC policy this is considered equivalent to testing positive for drugs and/or alcohol.  After a refusal, the resident's room is then searched for contraband as a matter of policy.  *Id.*  A refusing resident, like other residents violating SCC policy, is issued a BMR by SCC staff.  This creates the need for an ARH panel hearing to determine whether the BMR was warranted and if so, the appropriate behavioral remedy for the violation.  *Id.*, pp. 2-3.

Residents who tested positive for drugs and/or alcohol or who refused to give a UA sample were given a hearing.  If the resident was found to have committed the violation, they could be placed on a six-month testing program (Directed Testing Program) in which they would be tested more frequently than the purely random testing required for all residents.  *Id.*

As ARH Hearing Officer, Defendant Holmes-Ware wrote the February 28, 2008 memorandum to Mr. Calhoun informing him of the ARH panel's decisions regarding his refusal

REPORT AND RECOMMENDATION - 7

to submit to random UA testing on January 23, 2008.  *Id.*; Dkt. 54, Exh. 1.  According to

Defendant Holmes-Ware, the memorandum accurately reflects the panel's deliberative process

and the evidence considered.  *Id.*  The memorandum states, in part, as follows:

> **HEARING:**
> On February 28, 2008, you declined to attend your hearing.
>
> Panel members deliberated, taking into consideration:
> - Documents in the *SCC Investigation packet Incident* #08-0092.
>
> **FINDINGS:**
> The panel determined that your actions fit the definition of "Contraband: Refusing a Test", which is a Category 1 violation.  The panel found you in violation of *SCC Policy 235: Behavioral Intervention and Treatment.*
>
> The following decisions were made:
> - Category 1 infraction for "Contraband: Refusing a Rest" is affirmed.
> - You are referred to your Case Manager for behavioral interventions.
> - The panel recommends that the resident is placed on Directed Testing Program.
> - You are reduced from a Level 4 to a Level 2.
>
> **APPEAL:**
> Per Policy 238, Section X, "Residents who failed to attend their Administrative Review Hearing may not appeal the hearing results".

Dkt. 54-2, pp. 1-2.

Jamele Anderson and Kent Ruby participated in the ARH panel and Donna Waters, the

resident advocate was also present.  Dkt. 54, p. 3.  Carolyn Angers took the written notice of the

ARH panel decision to Mr. Calhoun, but he refused to sign it.  *Id.*

Ms. Holmes-Ware wrote and sent to Mr. Calhoun memoranda regarding his refusals and

subsequent extensions on Directed Testing on April 22, 2008 (refusal on April 1, 2008), May 20,

2008 (refusal on May 5, 2008), July 16, 2008 (refusal on June 4, 2008), August 26, 2008 (for

refusals on July 9 and August 7, 2008), and October 1, 2008 (refusal on September 4, 2008).

Dkt. 54, p. 4 and Exhs. 3-6.  Mr. Calhoun refused to participate in any of these panel hearings

REPORT AND RECOMMENDATION - 8

and waived his right to appeal the decisions of the ARH panel by not attending the hearing.  Dkt. 54, p. 4.  Because he refused to submit a UA as requested, the panel extended his DTP testing for six months following each refusal.

According to Ms. Holmes-Ware, Mr. Calhoun was not singled out for refusing to follow the random drug testing policy and every resident of the SCC is obligated to follow the random drug testing policy.  *Id.*  Mr. Calhoun was placed on Directed Testing because he refused to submit to random testing.  *Id.*  Defendant Holmes-Ware further states that Mr. Calhoun was not subject to additional punishment when, after continuing to refuse, the six-month period continued to "re-set" or roll over each time he refused to submit to another test.  *Id.*  The expectation, for every resident, is to complete an entire six months of Directed Testing by giving "clean" (negative) UA tests.  Defendant Holmes-Ware asserts that this is the way it works for every resident and there is no way to "get off" the six-month testing program without each and every requested UA coming back clean during the six-month probationary period.  *Id.*, pp. 4-5.

Defendant Holmes-Ware states that during the time period when Mr. Calhoun was on Directed Testing, residents found to have refused UAs in similar fashion to the way Mr. Calhoun did, were treated similarly.  *Id.*  In support of this statement, Ms. Holmes-Ware prepared and submitted a summary of all similar UA infractions in 2008 in a Microsoft Excel spreadsheet (with the names of residents other than Mr. Calhoun redacted to protect their privacy).  *Id.*, p. 5; Dkt. 54, Exh. 7.

Defendant Holmes-Ware's analysis of her UA infractions summary reflects that in 2008, 132 out of the 150 total BMRs for UAs (88%) were sustained by the ARH panel.  The eighteen dismissals (12%) were due to medical reasons, administrative errors, procedural inadequacies in testing, or negative/inconclusive lab test results.  *Id.*  For example, Ms. Holmes-Wares states that

prescribed medication could cause a false positive result, or a medical condition such as cancer could prevent that resident from urinating at that particular time the sample was requested, which is not a true refusal.  At least one dismissal was based on a resident's psychiatric problems based on a psychiatrist's diagnosis.  *Id.*  According to Defendant Holmes-Ware, Mr. Calhoun's intentional UA refusals did not fall within any of these exceptions.  *Id.*

Defendant Holmes-Ware states that she did not retaliate against Mr. Calhoun, did not knowingly assist anyone else in retaliating against him, and has no knowledge that any of her codefendants retaliated against him.  *Id.*  She further states that she had no knowledge of any agreement between the Attorney General's Office and Sam Eck regarding Mr. Calhoun until she received Mr. Calhoun's complaint in this action.  *Id.*  She states that she has no knowledge of any floppy disk being taken from Mr. Calhoun by SCC staff, of Mr. Calhoun contacting his attorney regarding the disk or of any resolution of that dispute.  *Id.*, pp. 5-6.

Finally, Defendant Holmes-Ware states that both the random drug testing program and the DTP were cut back and curtailed due to the State of Washington's financial and budgetary emergency.  *Id.,* p. 6.

*Defendant Kent Ruby.*  Mr. Ruby is the Substance Treatment Coordinator (STC) at the SCC.  Dkt. 55, p. 1.  As such, he evaluates any resident either referred by clinical staff or self-referred.  *Id.*

He also has assigned responsibilities in the SCC urinalysis testing program, which includes the DTP.  In that regard, he is responsible for the accuracy and distribution of the DTP List.  *Id.*  He compiled the DTP List from data submitted to him each month by Defendant Holmes-Ware, the Administrative Review Hearing Coordinator.  *Id.*  Each resident placed on this list is required to provide one Directed Testing urinalysis test per month while on the program.

REPORT AND RECOMMENDATION - 10

*Id.*  In addition to the names submitted by Defendant Holmes-Ware, the date the resident was placed on the program and the last date of eligible testing were also included on the DTP List. *Id.*

Mr. Ruby sent the DTP List to Byron Eagle, Area Program Services Manager (APSM), and APSM Eagle decided upon the day of the month each resident from the DTP List was to be given a urinalysis test.  *Id.*, pp. 2-3.   He also sent a copy of the DTP List to RRC3 Peter Robinson for testing implementation and to insure he had a correct copy of the DTP List with the dates testing for the resident was to be terminated.  *Id.*, p. 3.  There were approximately fifty residents admitted to the Directed Testing Program in 2008, including resident Ricky Calhoun. *Id.*

Defendant Ruby states that he is assigned to participate in one-half of all ARH which adjudicate BMRs. Dkt. 55, p. 4.  After reviewing the memoranda from Defendant Holmes-Ware to Mr. Calhoun, he notes that memoranda list him as being on the ARH panels relating to Mr. Calhoun.  Although he has no specific memory of those panels, he does not doubt the accuracy of the memoranda.  *Id.*  He states that whenever he agreed to extend Mr. Calhoun's six months on the DTP, it was because the evidence before him showed he either refused or failed a UA and had nothing to do with his other activities or beliefs.  *Id.*

Defendant Ruby states further that he did not retaliate against Mr. Calhoun in any way. *Id.*  He has no knowledge of any agreement between Sam K. Eck and Tim Lang of the Attorney General's office concerning Ricky Calhoun and he has no knowledge of any floppy disk being taken from Mr. Calhoun by SCC staff, communications between Mr. Calhoun and his counsel regarding the disk, or of any resolution of that dispute.  Dkt. 55, p. 4.

REPORT AND RECOMMENDATION - 11

According to Defendant Ruby, since April 2009 most of the alcohol and drug testing has stopped due to budget restrictions and only reasonable suspicion directed testing, urinalysis tests are being done on residents.  *Id.*, p. 5.

*Defendant Jamele Anderson.*  Jamele Anderson is a Residential Rehabilitation Counselor 4 at the SCC.  Dkt. 56, p. 1.  In 2008, he was a Residential Area Manager at SCC and part of his duties including sitting on the ARH panel.  *Id.*

In February 2008, Defendant Anderson and the other members of the ARH panel placed Mr. Calhoun in Directed Testing for six months due solely to his refusal to submit to a random UA test in January 2008.  *Id.*, p. 2.  According to Mr. Anderson, Mr. Calhoun was not singled out by the ARH panel for refusing to follow the random drug testing policy or the Directed Testing Program; every resident of the SCC is obligated to follow the random drug testing policy.  *Id.*

He states that Mr. Calhoun was not subject to additional punishment later in 2008 when, after refusing to give UA samples during the six-month Directed Testing period, the six-month period was restarted from the date of the last refusal after the subsequent hearing on each refusal. After each ARH hearing, the ARH panels that Defendant Anderson participated in appropriately determined that the Directed Testing would restart for such residents unless exceptional circumstances were present.  *Id.*, pp. 2-3.

According to Defendant Anderson, when Mr. Calhoun was on Directed Testing, all residents found by the ARH board to have refused UAs while on Directed Testing were adjudicated in the same manner as Mr. Calhoun and were treated in the same way.  *Id.*

He states that he had no knowledge of any agreement between the Attorney General's Office and Sam Eck regarding Mr. Calhoun until he received the Complaint in this action and

REPORT AND RECOMMENDATION - 12

had no knowledge of any floppy disk being taken from Mr. Calhoun, of Mr. Calhoun's communications with his attorney regarding the floppy disk, or resolution of a dispute regarding the floppy disk. *Id.*, p. 3. He also states that he is not related by blood or marriage to Durmont "Andy" Anderson. *Id.*

*MOTION TO STRIKE*

A trial court can only consider admissible evidence in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988). Rule 56(e) requires that affidavits be made on personal knowledge, that the affiant be competent to testify to the matters stated therein, and that sworn or certified copies of all papers referred to in an affidavit be attached thereto. In a summary judgment motion, documents authenticated through personal knowledge must be "attached to an affidavit that meets the requirements of Fed.R.Civ.P. 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence. *Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir. 1987) (citations omitted). "A document can be authenticated under Federal Rule of Evidence 901(b)(1) by a witness who wrote it, signed it, used it, or saw others do so." Wright & Gold, *Federal Practice & Procedure: Evidence* § 7106, 43 (2000).

The court is compelled to search the record for evidence supporting the record for evidence supporting the position of the pro se litigator. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence . . . "). Said evidence need not be in admissible form, but merely susceptible to being placed in such form at trial. *Fraser v.*

REPORT AND RECOMMENDATION - 13

1    *Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); See also *Aholeli v. Hawaii Dept. of Public Safety*,

2    220 Fed. Appx. 670 (9th Cir. 2007).

3           Here, Defendants move to strike the declarations submitted by Mr. Calhoun and Sam Eck

4    pursuant to Local Rule 7(g) and the Federal Rules of Evidence.  Dkt. 86, pp. 9-10.

5           As to Mr. Calhoun's declaration, Defendants object to ¶¶ 5, 6, 8, 9, 10, 11, 13, 22, 23, 24,

6    27, 33, 34, 35, 38, 39 and 40 as conclusory statements; ¶¶ 10, 16, 19, 20, 25, 26, 30, 32, 34, 39,

7    40 and 41 as hearsay; ¶¶ 5, 11, 13, 20, 23, 27, 34, 35, 37, 38, 39 and 40 as lay opinion; and, ¶¶

8    10, 16, 39 and 40 as lacking in personal knowledge.  Dkt. 86, p. 10.   Defendants also object to

9    Plaintiff's summary of the Defendants' deposition testimonies contained in his response (Dkt.

10   81, pp. 2-4).  *Id.*

11

12          The undersigned agrees that Paragraph 11 of Mr. Calhoun's declaration sets forth his

13   conclusion as to what the Email Agreement meant.  That agreement, however, is in the record

14   and the court relies solely on the language written in the agreement and not Mr. Calhoun's

15   interpretation.  The motion to strike this paragraph is granted.

16

17          Paragraphs 39 and 40 clearly are not based on personal knowledge but rather, are

18   hearsay.  The motion to strike these two paragraphs is granted.  The undersigned also notes that

19   the issues raised in these two paragraphs have nothing to do with the issues raised in Mr.

20   Calhoun's amended complaint and do not create any material issues of fact with regard to this

21   motion for summary judgment.

22

23          It is also true that a number of paragraphs contained in Mr. Calhoun's declaration do not

24   raise any issues of fact regarding the matter set forth in his amended complaint.  However, to the

25   extent that his declaration does contain facts that are admissible into evidence and are relevant to

26

REPORT AND RECOMMENDATION - 14

the matter at hand, the court will take those facts into consideration in ruling on the motion for

summary judgment.

As to Mr. Eck's declaration, Defendants object to ¶¶ 2, 3, 5, 7, 10 and 11 as conclusory;

¶¶ 2, 3, 5, 6, 7, 8, 9 and 11 as hearsay; and ¶¶ 2, 4, 5, 7, 8, 9, and 11 as lacking personal

knowledge.  Dkt. 86, p. 11.

The court agrees that the following paragraphs, or portions thereof, should be stricken

from consideration for purposes of this summary judgment motion:  3, 4, 5, 7, and 11.

Paragraph 3, to the extent it contains Mr. Eck's conclusions as to what the Email

Agreement meant, shall be stricken.  That agreement is in the record and the court relies solely

on the language written in the agreement and not Mr. Eck's interpretation.

The following language contained in Paragraph 4 is stricken:  "This arrangement was fine

until Rickey gave another inmate/resident a disk with a motion for review to the Court of

Appeals."  This sentence contains Mr. Eck's inadmissible opinion regarding the situation.

Paragraph 5 is clearly based on hearsay and inadmissible opinion.  It is stricken.

Paragraph 7 is also based on hearsay and inadmissible opinion.  It is stricken.

Paragraph 11 again is based on hearsay and inadmissible opinion.  It is stricken.

The balance of the Defendants' motion to strike is denied as to Mr. Eck's declaration.

*SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when, viewing the evidence in the light most favorable

to the non-moving party, there exists "no genuine issue as to any material fact" such that the

"moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A material fact is

a fact relevant to the outcome of the pending action.  See *Anderson v. Liberty Lobby, Inc.*, 477

REPORT AND RECOMMENDATION - 15

1   U.S. 242, 248 (1986).  Genuine issues of material fact are those for which the evidence is such

2   that "a reasonable jury could return a verdict for the nonmoving party."  *Id.*

3       In response to a properly supported summary judgment motion, the nonmoving party

4   may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts

5   demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the

6   existence of the elements essential to his case.  *See* Fed.R.Civ.P. 56(e).  A mere scintilla of

7   evidence is insufficient to create a factual dispute.  *See Anderson*, 477 U.S. at 252.  In ruling on

8   summary judgment, the court does not weigh evidence to determine the truth of the matter, but

9

10  "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d

11  547, 549 (9th Cir. 1994).

12                          *SECTION 1983 STANDARD*

13      In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that

14

15  he suffered a violation of rights protected by the Constitution or created by federal statute, and

16  (ii) that the violation was proximately caused by a person acting under color of state law.  *See*

17  *Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983 is

18  satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

19

20  another's affirmative act, or omitted to perform an act which he was legally required to do that

21  caused the deprivation complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981)

22  (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

23      In the civil commitment setting, a patient's liberty interests are balanced against the

24

25  relevant state interests to determine whether the state has violated the patient's constitutional

26  rights.  *Youngberg v. Romeo*, 457 U.S. 307, 318 (1982).  The law generally requires a careful

    balancing of the rights of individuals who are detained for treatment, not punishment, against the

REPORT AND RECOMMENDATION - 16

state's interests in institutional security and the safety of those housed at the facility. See also,

*Hydrick v. Hunter*, 500 F.3d 978, 990 (9th Cir.2007) (citing *Youngberg*, 457 U.S. at 319-22):

> In weighing those interests, it cannot be ignored that, unlike the plaintiff in
> *Youngberg*, who was civilly committed because of mental infirmities, SVPs have
> been civilly committed subsequent to criminal convictions and have been
> adjudged to pose a danger to the health and safety of others. Therefore, the rights
> of SVPs may not necessary be coextensive with those of all other civilly detained
> persons.

*Hydrick*, 500 F.3d at 990.

*DISCUSSION*

As a threshold matter, the court notes that Mr. Calhoun does not claim that the random

UAs, which he refused, were conducted in violation of SCC policies or that he was denied due

process at his BMR hearings, which he chose not to attend.[4]  Instead, Mr. Calhoun claims that

the requested random UA, his placement in the DTP, and subsequent extensions of the six-month

term of the DTP, were in retaliation for his attorney's intervention regarding the floppy disk

incident.

*A.      Retaliation*

A viable claim of First Amendment retaliation entails five basic elements: (1) an

assertion that a state actor took some adverse action against an inmate (2) because of (3) that

inmate's protected conduct, and that such action (4) chilled the inmate's exercise of his First

Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

---

[4] Mr. Calhoun does argue that SCC Policies 414 and 415, which govern how to collect and store urine samples and
the taking of breathalyzers, do not authorize more drug and alcohol testing for a period of six months when a
resident has refused a test. Dkt. 81, p. 10.  As noted above, however, the ARH panel determined that Mr. Calhoun's
refusal to submit to the random UA fit the definition of "Contraband: Refusing a Test", a Category 1 violation, and
found him in violation of *SCC Policy 235: Behavioral Intervention and Treatment.*  Dkt. 54-2, pp. 1-2.  And, SCC
Policy 414 does provide that all SCC residents are subject to random  UAs.  Dkt. 49, Exh. 1; see also, Dkt. 83, p. 7
(Policy 404 Urine Testing for Contraband Substances)

REPORT AND RECOMMENDATION - 17

See, e.g., *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir.2000); *Barnett v. Centoni*, 31 F.3d 813, 815-16 (1994).   Challenges to institutional restrictions that are asserted to inhibit First Amendment interests must also be analyzed in terms of the legitimate policies and goals of the corrections system.  *Pell v. Procunier*, 417 U.S. 817 (1974).

  *1)  Constitutionally Protected Conduct*

  The challenge presented by the Plaintiff's Amended Complaint is the lack of clarity regarding the particular First Amendment constitutional right he asserts.  Before the court can even consider a claim for retaliation, the Plaintiff must show that he was exercising a constitutional right or engaging in constitutionally protected conduct.

  It appears that Mr. Calhoun is asserting a constitutional right to contact his attorney. While prisoners generally have no right to contact visitation, see *Barnett*, 31 F.3d at 817, they do have a right to contact visitation with their attorneys encompassed by their right of access to the courts, see *id*. at 816; see also *Casey v. Lewis*, 4 F.3d 1516, 1523 (9th Cir.1993).  As a jurisdictional requirement flowing from the standing doctrine, the prisoner must allege an actual injury to successfully plead a claim based on denial of access to the courts.  See *Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).  Contact with an attorney via the telephone is included within this right.

  Mr. Calhoun also asserts that the actions of the defendants "constitute restrictions on Plaintiff's right to file complaints against those he is incarcerated by" in violation of his First Amendment rights.  Dkt. 9, p. 10.  While the Constitution guarantees detainees meaningful access to the courts, it is less than clear that the seizure of a copy of a disk from someone other than the plaintiff is a constitutionally protected right.  However, for purposes of this motion only,

REPORT AND RECOMMENDATION - 18

the undersigned assumes that Mr. Calhoun is asserting his constitutional right to meaningful

access to the courts, both with regard to contacting his attorney and to filing lawsuits.

     2)  *Proof of Retaliatory Intent*

The intent to inhibit a constitutionally protected right may be demonstrated either through

direct or circumstantial evidence.  See *Magana v. Commonwealth of N. Mariana Islands*, 107

F.3d 1436, 1448 (9th Cir. 1997) (circumstantial evidence is sufficient to survive summary

judgment motion).  For example, in *Hines v. Gomez,* the Ninth Circuit held that circumstantial

evidence that an inmate had a reputation for filing grievances and had told a guard that he

planned to file a grievance, combined with the jury's rejection of the guard's purported reason

for punishing the inmate, "warrants the jury's finding that [the guard] filed the disciplinary report

in retaliation for [the prisoner's] use of the grievance system."  108 F.3d at 268.

As noted above, Mr. Calhoun concedes that each and every resident of the SCC is subject

to random UAs and random room searches and that it would be a breach of SCC security for a

resident to see the current random UA or room search list at the time of the actual search or UA.

Dkt. 60, Exh. 2, pp. 38:1-15; 39:9-19.  He relies, however, on the fact that Mr. Robinson's

request that he submit to a random UA occurred only 6 days after his attorney complained about

the floppy disk incident.

Timing can properly be considered as circumstantial evidence of retaliatory intent. See,

e.g., *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir.1989).  However, timing

alone is insufficient to create a genuine issue of material fact regarding retaliatory motive.  *Pratt

v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).  In this particular case, there is nothing other than

the timing of the request for the random UA to support the inference that the request was

retaliatory.

REPORT AND RECOMMENDATION - 19

1
2
3
4
5
6
7
8
9

Mr. Calhoun alleges that the Defendants knew the request that he submit to the random UA was not random, but retaliatory for prior complaints, and that despite this knowledge, they nevertheless placed him on the DTP which requires a resident to test "clean" for six months straight.  However, Mr. Calhoun provides no evidence to support these allegations.  He provides no evidence to establish a causal link between contacting his attorney regarding the confiscation of his floppy disk and placement of his name on a randomly generated computer program. Indeed, Mr. Calhoun acknowledged during his deposition that unannounced room searches and UAs are normal and expected parts of living at the SCC facility.  Dkt. 60, Exh. 2, p. 38:1-15.

10
11
12
13
14
15
16
17
18

Mr. Calhoun has failed to establish that Defendant Robinson personally participated in placing his name on the random UA list.  See, e.g., *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant.").  He has also failed to show that Defendant Robinson acted in retaliation when he wrote the BMR after Mr. Calhoun refused the random UA test.  The evidence reflects that Defendant Robinson's UA request of Mr. Calhoun and the search of Mr. Calhoun's room after Mr. Calhoun refused to take the UA were done in accordance with standard SCC policy.  Dkt. 53, p. 2.

19
20
21
22
23
24
25
26

Similarly, Mr. Calhoun provides no evidence for his conclusory statements that Defendants Robinson, Ruby, Holmes-Ware and Anderson knew of his calling his attorney regarding the Floppy Disk incident.  In fact, the undisputed evidence before the court is that these Defendants were not involved in or were aware of the circumstances surrounding Plaintiff contacting his attorney.  The undisputed evidence shows that the requests for UAs from Mr. Calhoun were based on the random testing list, that the decision to place him on the DTP

REPORT AND RECOMMENDATION - 20

followed his refusal to take the UA, and subsequent "renewals" of the six month DTP were dictated by Mr. Calhoun's own actions in continuing to refuse the requested UAs.

Mr. Calhoun claims that Byron Eagle, the SCC employee who generated the random UA list containing his name, must have been aware of the floppy disk incident because it was part of Mr. Eagle's duties to read the daily log book, which must have contained a notation that the Attorney General Office contacted SCC and informed them to check the disk and see if it contained anything improper.  Dkt. 81, pp. 11-12.   This is not competent summary judgment evidence of retaliatory intent as to Defendants Robinson, Ruby, Holmes-Ware and Anderson. Mr. Calhoun's statements are conclusory and speculative.  There is no evidence that the floppy disk incident was part of any log or that Mr. Eagle – who is not a party to this action – had any knowledge of the incident or shared it with any of the Defendants.

Thus, Mr. Calhoun has failed to create a material question of fact as to whether the named defendants took some adverse action because of the Plaintiff's exercise of a constitutional right.  The evidence is undisputed that the plaintiff was requested to submit a random UA which he refused to do.  The resulting room search, BMR and hearing followed by placement in the DTP, were the result of the Plaintiff's action – his refusal to submit a UA – and not due to any retaliatory actions on the part of the defendants.

*3)  Legitimate Penological Interest*

In order to survive summary judgment, the plaintiff bears the burden of showing that there was no legitimate penological objective to defendants' actions.  *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).   The Plaintiff bears the burden of proving that the allegedly retaliatory action served no legitimate penological purpose.  *Bruce*, 351 F.3d at 1289. Accordingly, when the government has submitted evidence of a legitimate penological purpose,

REPORT AND RECOMMENDATION - 21

the plaintiff must present evidence of retaliatory motive in order to avoid dismissal or summary

judgment.  See *Pratt*, 65 F.3d at 808-10 (holding plaintiff failed to demonstrate a likelihood of

success on the merits where he failed to submit any evidence contradicting the defendants'

evidence of legitimate correctional purposes); *Davis v. Valdes*, 462 F. Supp.2d 1084, 1096 (C.D.

Cal. 2006) (granting summary judgment where the plaintiff failed to rebut the defendants'

testimony concerning legitimate penological purpose with any evidence other than plaintiff's

own "bare statements"); *Hurd v. Garcia*, 454 F. Supp. 1032, 1050 (S.D. Cal. 2006) (granting

summary judgment where the plaintiff "fail[ed] to contradict the evidence in the record that

Plaintiff was transferred to Facility C to protect him from inmate assault").

The Ninth Circuit has long recognized that the preservation of institutional order and

discipline constitutes a legitimate penological goal.  See *Barnett v. Centoni*, 31 F.3d 813 (9th Cir.

1994).  However, officials "may not defeat a retaliation claim on summary judgment simply by

articulating a general justification for a neutral process when there is a genuine issue of material

fact as to whether the act was taken in retaliation for the exercise of a constitutional right."

*Bruce*, 351 F.3d at 1289 (citing cases).

Mr. Calhoun has not met his burden of proving the absence of legitimate correctional

goals for the conduct of which he complains.  Mr. Calhoun states broadly in his complaint that

the UAs given by the SCC do not serve any legitimate [institutional] goal or purpose.  Dkt. 9, ¶

37.  However, he provides no competent summary judgment evidence reflecting that the

decisions of Defendants Holmes-Ware, Ruby and J. Anderson regarding his UA test refusals,

either the random UA test refusal or those occurring under the six-month DTP, were punitive or

bore no reasonable relationship to the purpose of his commitment.  *Seling v. Young*, 531 U.S.

250, 265 (2001); *Jonas v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (although an individual

REPORT AND RECOMMENDATION - 22

detained under civil process cannot be subject to conditions amounting to punishment, "[l]egitimate, non-punitive government interests include … effective management of a detention facility").

Mr. Calhoun argues that because he has been a resident of SCC since July of 2002 and was never asked for a random UA before the one in January 2008, the UA program was never meant to deter or stop drug use at SCC, but instead has been used as a way for the SCC to force non-treatment residents into treatment, punish those who stand up for their rights, and a tool for SCC managers to retaliate against residents who complaint of their abuses.  Dkt. 81, p. 4.  Mr. Calhoun also argues that the UA program cannot be considered an essential safety and security function as it has since been discontinued and the Defendants' proffered reason of budgetary cuts is not plausible.  *Id.*  In support, Mr. Calhoun submits letters he received from the DSHS in response to his public disclosure request, reflecting the amount spent in overtime to SCC staff.  Dkt. 83-2, Attach. 1.  Based on these figures, Mr. Calhoun argues that from June 2008 through June 2009, SCC has spent over $2 million in overtime, and concludes that SCC cut "a critical part of their security so their staff could work more overtime."  Dkt. 81, pp. 4-5.

Mr. Calhoun's speculation regarding budgetary cuts does not raise an issue of material fact as to whether any individual defendant in this action acted in retaliation for protected conduct.  Whether or not the random UA testing or DTP have been cut back or curtailed in favor of other SCC functions is not material to whether random and directed testing are reasonable means of serving a legitimate institutional goal of the SCC.

The undisputed evidence reflects that the SCC is a total confinement treatment facility designed for persons committed and detained as sexually violent predators under section 71.09.020(13).  "(I)t is irrefutable that the State has a compelling interest both in treating sex

REPORT AND RECOMMENDATION - 23

predators and protecting society from their actions." *In re Young*, 122 Wash.2d 1, 26, 857 P.2d 989, 1000 (1993). "The treatment needs of (the SVP) population are very long term, and the treatment modalities for this population are very different than the traditional treatment modalities for people appropriate for commitment under the involuntary treatment act." *See* Wash.Rev.Code 71.09.010.

Defendants have also provided undisputed evidence that maintaining a mental health facility for mentally disturbed individuals free of recreational drugs and alcohol is a legitimate institutional goal and that random testing and directed testing are reasonable means of serving those goals. According to Ms. Holmes-Ware, SCC residents all have or are suspected of having mental conditions which prevent them from properly functioning in society and therefore, some SCC residents take prescribed medication for their condition. Non-prescribed drugs and alcohol, however, are banned from the SCC grounds. Dkt. 54, p. 2. Also, many residents of the SCC enter the facility with a history and/or present pattern of various chemical dependencies which contributed to their mental condition. *Id.* Random urinalysis (UA) helps residents confront their abuse of drugs, narcotics, and alcohol with scientific evidence of current use, and gives residents further incentive to abstain from drugs and alcohol and follow the therapeutic policies at the SCC. *Id.*

In addition, all SCC residents are subject to random UA drug testing. Dkt. 54, ¶ 8; Dkt. 57, ¶ 3. Pursuant to SCC policy, when a resident refuses to provide a UA sample, it is considered the same as a positive test, and the resident's room is searched for contraband. Dkt. 54, ¶ 9; Dkt. 57, ¶ 7. The resident is then issued a BMR and given an ARH hearing to determine whether the BMR was warranted. Dkt. 54, ¶ 10.

REPORT AND RECOMMENDATION - 24

Viewing the summary judgment evidence in the light most favorable to Mr. Calhoun, the undersigned concludes that Mr. Calhoun's claim of retaliation must be dismissed because he has failed to demonstrate proof of retaliatory motive and absence of a legitimate penological interest. Accordingly, it is recommended that Defendants' motion for summary judgment with respect to any claim of retaliation based on their participation in the random and directed UAs, BMR's, BMR hearings, and placement of Mr. Calhoun in the DTP and subsequent "renewals" of Mr. Calhoun's placement in DTP be GRANTED.

B.      *Contractual Violation*

Mr. Calhoun alleges that the extensions of the six-month DTP violated the Email Agreement.[5]  Dkt. 9, ¶ 29.  He claims that the Email Agreement precluded the Defendants from requiring him to submit to random UA testing and/or room searches because they did not first obtain permission to do so from Walter Weinberg.  The undisputed evidence, however, including Mr. Calhoun's testimony, reflects that the Defendants were not aware of the Email Agreement, were not parties to the Email Agreement, and that the Email Agreement related solely to persons and events that are not the subject of this lawsuit.

Contractual disputes arise under state law, but only deprivations of federal rights (*i.e.*, U.S. Constitution or federal statues) are actionable under § 1983, not violations of state law. *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 102 S. Ct. 2744, 73 L.Ed.2d 482 (1982).  The procedural guarantees of the Due Process Clauses of the Fifth and Fourteenth Amendments apply only when a constitutionally protected liberty or property interest is at stake.  *See Ingraham v. Wright*, 430 U.S. 651, 672-73 (1977); *Bd. Of Regents v. Roth*, 408 U.S. 564, 569

---

[5] For purposes of this summary judgment motion, Defendants concede that the Email Agreement may be viewed as a valid agreement, the terms of which were in effect in 2008.  Dkt. 52, p. 7 n. 3.

REPORT AND RECOMMENDATION - 25

(1972); *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003); *Neal v. Shimoda*, 131 F.3d 818, 827 (9th Cir. 1997); *Erickson v. 139 United States*, 67 F.3d 858, 861 (9th Cir. 1995); *Schroeder v. McDonald*, 55 F.3d 454, 462 (9th Cir. 1995); *Tellis v. Godinez*, 5 F.3d 1314, 1316 (9th Cir. 1993).

The Email Agreement referred to four SCC staff members, not to any of the Defendants. The subject of the Email Agreement was plaintiff's deferred punishment for a prior SCC policy violation in January 2007.  Dkt. 58, ¶¶ 4-8; Dkt. 58, Exh. 1.  Defendants named in this lawsuit were not parties to, nor did they have knowledge of, the January 2007 agreement.  Dkt. 56, ¶ 10; Dkt. 54, ¶ 15; Dkt. 55, ¶¶ 13-14; Dkt. 53, ¶ 10.

Mr. Calhoun appears to be arguing that Defendants should have been bound by the Email Agreement, because he bases his § 1983 claims, in part, on the Defendants' failure to obtain permission from Walter Weinberg prior to subjecting him to any random or direct UAs. Contracts, however, are governed by state law, and "state law may serve as a basis for § 1983 liability only where such violation is cognizable under federal law." *Devereaux v. Perez*, 218 F.3d 1045, 1056 (9th Cir. 2000).  Plaintiff has failed to establish that Email Agreement created constitutional obligations on Defendants Robinson, Ruby, Holmes-Ware and/or Jamele Anderson, who were neither aware of nor identified in such a document.

Similarly, the Email Agreement cannot serve as the basis of a retaliatory intent as to persons who were neither aware of nor identified in such a document.  See, e.g., *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant.").

Viewing the evidence in the light most favorable to Mr. Calhoun, the court concludes that the Email Agreement did not create any constitutional obligations on Defendants Robinson,

REPORT AND RECOMMENDATION - 26

Ruby, Holmes-Ware and/or Jamele Anderson and their motion for summary judgment on all claims against them based on a violation of the Email Agreement should be GRANTED.

C.    *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall deny any person equal protection of the laws.  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).  Thus, all persons similarly situated should be treated alike.  *Id.*; *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).  Dissimilar treatment of dissimilarly situated persons does not violate Equal Protection. See *Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir.1996); *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 242 (8th Cir.1994).

To state an equal protection claim, a plaintiff must allege (1) membership in a suspect class, (2) deprivation of a fundamental right, or (3) enforcement of state laws or regulations in an arbitrary or invidiously discriminatory manner. State action that does not implicate either a fundamental right or a suspect classification will pass constitutional muster under the Equal Protection Clause if it bears a rational relation to a legitimate state interest.  *See Heller v. Doe*, 509 U.S. 312, 319, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993) ("[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity."); *Webber v. Crabtree*, 158 F.3d 460, 461 (9th Cir.1998) (citing *Coakley v. Murphy*, 884 F.2d 1218, 1221-22 (9th Cir. 1989)).  A plaintiff alleging a denial of equal protection bears the burden of establishing a prima facie case of discrimination.  *See United States v. Estrada-Plata*, 57 F.3d 757, 760 (9th Cir. 1995).

Mr. Calhoun did not allege any of the requisite equal protection elements or facts supporting them in his Complaint.  Thus, his claim can be dismissed for that reason alone.  *See*

REPORT AND RECOMMENDATION - 27

1  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929

2  (2007).  Moreover, Mr. Calhoun has not established that he is a member of a protected class or

3  that he was treated differently from similarly situated SCC residents.

4        Mr. Calhoun alleges that the Defendants treated him differently from other similarly

5  situated residents who refused UAs because they were given less severe punishments than he

6  received.  Dkt. 9, ¶ 36.  Mr. Calhoun states that he has not been provided with "individualized

7  treatment" because "other residents and staff have misbehaved, or broken the rules."  Dkt. 82, p.

8  6.  Mr. Calhoun also submits a list he obtained through a public disclosure request from the

9  DSHS reflecting residents found guilty of refusing UAs.  Dkt. 81, p. 9; Dkt. 83, Attach. 3. He

10  argues that the list shows "a number of residents who refused UA's and did not get admitted to

11  the directed testing program."  Dkt. 81, p. 9.  Mr. Calhoun fails to demonstrate, however, that

12  the residents who were not placed in the Directed Testing Program were similarly situated to him

13  when he and other residents who refused a UA, were placed in the DTP.  Such conclusory

14  assertions are wholly insufficient to sustain Mr. Calhoun's burden to set forth specific facts

15  demonstrating a genuine issue of fact for trial and to produce evidence sufficient to establish the

16  existence of the elements essential to his equal protection claim.  Mr. Calhoun provides no

17  admissible evidence of any disparate treatment or sanctions.

18        Conversely, Defendant Holmes-Ware, the Hearings Officer who presided over Mr.

19  Calhoun's ARH panels, prepared and produced a summary of all residents who received or

20  refused UAs, the sanctions received, and an explanation for the dismissals of other BMRs for

21  refusals.  Dkt. 54, Exh. 7, ¶ 19.  That summary reflects that in 2008, 132 out of the 150 total

22  BMRs for UAs (88%) were sustained by the ARH panel.  The eighteen dismissals (12%) were

23

24

25

26

REPORT AND RECOMMENDATION - 28

1    due to medical reasons, administrative errors, procedural testing inadequacies, or negative and/or

2    inconclusive lab test results.  *Id.*, p. 5; Dkt. 54, Exh. 7.

3            According to the undisputed evidence before the court, the random UA requested for Mr.

4    Calhoun, his placement on the Directed Testing Program, and the extension of his time on the

5    six-month Directed Testing Program, were all typical results and that Mr. Calhoun was not

6    treated differently than other similarly situated residents. This evidence is undisputed.

7            Accordingly, the undersigned recommends that Defendants' motion for summary

8    judgment on Mr. Calhoun's Fourteenth Amendment Equal Protection claim be GRANTED.

9

10   D.      *Qualified Immunity*

11           Defendants contend that they are entitled to qualified immunity as to Plaintiff's

12   constitutional claims.  "Qualified immunity is 'an entitlement not to stand trial or face the other

13   burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272

14   (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

15   The court evaluates a defendant's qualified immunity defense using a two-step inquiry.  *Id.*

16   However, the Supreme Court recently held that this two-step inquiry is no longer an inflexible

17   requirement.  *Pearson v. Callahan*, ---U.S. ---, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)

18   (explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no

19   longer be regarded as mandatory").  It is within our "sound discretion in deciding which of the

20   two prongs of the qualified immunity analysis should be addressed first in light of the

21   circumstances in the particular case at hand."  *Id.*

22

23           Under *Saucier's* first prong, the court must determine whether, viewing the facts in the

24   light most favorable to the plaintiff, the government employees violated the plaintiff's

25   constitutional rights.  *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.  If the court determines that a

26

REPORT AND RECOMMENDATION - 29

constitutional violation has occurred, under *Saucier's* second prong, it must determine whether the rights were clearly established at the time of the violation.  *Id*.  For a right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates the right."  *Id*. at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  The protection afforded by qualified immunity "safeguards 'all but the plainly incompetent or those who knowingly violate the law.'"  *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist*., 149 F.3d 971, 977 (9th Cir.1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

It is not necessary to address Defendants' arguments that qualified immunity should be applied to Plaintiff's First, Fourth, Fourteenth and Equal Protection claims because the undersigned has concluded that these Defendants did not violate the Plaintiff's constitutional rights.

*CONCLUSION*

Mr. Calhoun is unable to show any constitutional violations in this matter.  His Amended Complaint alleges incidents at SCC that, even if true, do not rise to the level of constitutional significance as he has not demonstrated that the Defendants retaliated against him, breached any contractual obligation, or denied him equal protection of the law.  Accordingly, the undersigned recommends that Defendants' motion for summary judgment (Dkt. 52) be **GRANTED** and that Mr. Calhoun's claims against Peter Robinson, Kent Ruby, Latoya Holmes-Ware and Jamele Anderson in this case be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written

REPORT AND RECOMMENDATION - 30

objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the

time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

**April 23, 2010**, as noted in the caption.


        DATED this   2nd   day of April, 2010.


                                              Karen L. Strombom
                                              United States Magistrate Judge


REPORT AND RECOMMENDATION - 31